HAWKEYE LAND COMPANY,
Appellant,

v.

IOWA POWER AND LIGHT
COMPANY, Appellee.

No. 91–1413.

Court of Appeals of Iowa.

Feb. 2, 1993.

Joe H. Harris, Cedar Rapids, for appellant.

Thomas P. Jorgensen, Dawn R. Siebert, and Hugh J. Cain of Duncan, Jones, Riley & Finley, P.C., Des Moines, for defendant-appellee.

Heard by DONIELSON, P.J., and SACKETT and HABHAB, JJ.

DONIELSON, Presiding Judge.

Hawkeye Land Company appeals from the district court's ruling which denied its claim for unpaid rent against Iowa Power under certain wire line license agreements.

This case involves contracts known as "wire line license agreements." Wire line license agreements permitted Iowa Power to construct and maintain its electrical wires and natural gas pipelines running parallel to or over railroad tracks for an annual rental charge. The licenses in question were originally held by the Rock Is-

land Railroad Company (Rock Island). In approximately 1979, Rock Island went into bankruptcy. During its reorganization, a new entity called the Chicago Pacific Corporation (CPAC) was created and the bankruptcy trustee began liquidating Rock Island's real estate holdings in order to satisfy creditors. As part of this process, CPAC negotiated with utility companies to discharge the wire line license agreements and convert them to permanent easements.

Beginning in 1983, Iowa Power and CPAC entered into these same negotiations. The negotiations involved detailed railroad track maps which identified where Rock Island property had been located in Iowa. CPAC told Iowa Power to indicate on the maps the location of its wire lines and pipelines on the railroad's property. After completion, the original maps were returned to CPAC. (These maps were never offered into evidence at trial.)

After reviewing the track maps, CPAC prepared eighteen easement grants which allegedly represented the easements granted to Iowa Power. On October 29, 1985, James McKenzie, CPAC's senior easement officer, submitted the easement grants to a CPAC officer for execution.

At about the same time, Richard Myers of Iowa Power's real estate department was in contact with McKenzie. At trial, Myers testified he had agreed with McKenzie in a telephone conversation that *all* of Iowa Power's facilities on CPAC's right of way would be sold to CPAC for $95,040. Myers subsequently recorded the content of this conversation in a written memorandum. Iowa Power then delivered a $95,040 check, dated November 6, 1985, to CPAC. On the check was typed: "acquisitions of permanent easement for *all* facilities on Chicago Rock Island right of way." (Emphasis added.) CPAC's records showed the check was endorsed and cashed in December 1985.

On November 12, 1985, CPAC faxed a memo of intent to Iowa Power which stated the conversion agreement was limited to the eighteen easement grants dated October 29, 1985. The memo was signed by an officer of CPAC, but was neither signed nor acknowledged by any Iowa Power employees who had been negotiating the conversion agreement with CPAC. Iowa Power subsequently received the eighteen easement grants which had been prepared by CPAC. However, Iowa Power never reviewed the grants or complained to CPAC that the grants did not include all the Iowa Power facilities on the railroad right of way.

On July 1, 1985, Hawkeye Land Company (Hawkeye) attained a quitclaim deed from CPAC for certain real estate and real estate rights. However, the interest conveyed to Hawkeye was limited by the language in Hawkeye's April 29, 1985, offer to purchase. In the offer to purchase, CPAC had reserved the right to convert any licenses for electrical power lines and other utilities to permanent easements for a period of 120 days following the delivery of the quitclaim deed to Hawkeye. This provision was added to cover the pending negotiations between CPAC and Iowa Power regarding the conversion of licenses to permanent easements.

In 1988, Hawkeye informed Iowa Power that it had discovered certain license agreements which had not been converted to easements and for which delinquent rent was owed. Iowa Power responded that all the licenses had been converted to easements in 1985 under the conversion agreement between Iowa Power and CPAC. Hawkeye subsequently commenced legal action seeking the unpaid rent. Iowa Power asserted Hawkeye had no enforceable interest because all the licenses had been converted into permanent easements, and even if the licenses had not been converted, Hawkeye was equitably estopped from recovering the allegedly overdue rent.

At trial, Hawkeye claimed CPAC's November 12, 1985, memo of intent was the actual conversion agreement. Iowa Power contended the check, which was dated November 6, 1985, and signed by both parties, was the conversion agreement. On August 15, 1991, the district court entered a ruling dismissing Hawkeye's petition for unpaid rent. The court determined the wire line license agreements were canceled pursuant

to the conversion agreement between Iowa Power and CPAC, and that Hawkeye received no rights to enforce the licenses under its quitclaim deed from CPAC. The court found the November 6, 1985, check, including its provision that the agreement covered "all facilities on the Chicago Rock Island right of way," was the actual conversion agreement. The court found the November 12, 1985, memo of intent, which had been drafted by CPAC, was inadmissible evidence under the statute of frauds because it was signed by only CPAC. The court also concluded that, even if the conversion agreement did not cover all of Iowa Power's facilities, Hawkeye was equitably estopped from recovery.

Hawkeye now appeals. Hawkeye contends the district court erred in (1) finding Hawkeye was on constructive notice of Iowa Power's interest in the easements, and concluding the quitclaim deed from CPAC did not convey the licenses to Hawkeye; (2) finding the November 12, 1985, memo of intent was inadmissible and refusing to consider extrinsic and parol evidence in interpreting the conversion agreement; (3) ruling Hawkeye had the burden of showing that none of the thirty-one licenses in dispute were originally marked by Iowa Power on the track maps; (4) not finding evidence establishing Iowa Power's mistake of contract; and (5) concluding equitable estoppel would deny Hawkeye recovery. On our review, we affirm the district court.

■ Our scope of review is for the correction of errors of law. Iowa R.App.P. 4. Findings of facts in a law action are binding on us if supported by substantial evidence. Iowa R.App.P. 14(f)(1). We construe the district court's findings broadly and liberally. *Grinnell Mut. Reins. Co. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988). In case of doubt or ambiguity we construe the findings to uphold, rather than defeat, the district court's judgment. *Id.* We are prohibited from weighing the evidence or the credibility of the witnesses. *Id.*

A finding of fact is supported by substantial evidence if the finding may be reasonably inferred from the evidence.

In evaluating sufficiency of the evidence, we view it in its light most favorable to sustaining the court's judgment. We need only consider evidence favorable to the judgment, whether or not it was contradicted.

*Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 808 (Iowa 1978).

■ "Evidence is substantial or sufficient when a reasonable mind could accept it as adequate to reach the same findings." *Waukon Auto Supply v. Farmers & Merchants Sav. Bank*, 440 N.W.2d 844, 846 (Iowa 1989) (citation omitted). Evidence is not insubstantial merely because it could support contrary inferences. *Grinnell Mut. Reins. Co.*, 431 N.W.2d at 785 (citation omitted).

**I. Hawkeye's Notice of Iowa Power's Easement Interest.** Hawkeye first contends the district court's finding that Hawkeye was on constructive notice of Iowa Power's asserted easement interest in the subject licenses was not supported by substantial evidence. Hawkeye also contends the district court erred in concluding the quitclaim deed from CPAC did not convey the licenses to Hawkeye.

■ In interpreting a deed, the intent of the grantor is the polestar. *Skoog v. Fredell*, 332 N.W.2d 333, 334 (Iowa 1983) (citations omitted). A quitclaim deed conveys to the grantee whatever interest the grantor has in the property conveyed. *Swab v. Appanoose Country Club*, 203 N.W.2d 318, 319 (Iowa 1972). A grantee of a quitclaim deed is not a bona fide purchaser, and takes only the interest of the grantor. *Springer v. Bartle*, 46 Iowa 688, 690 (1877). However, even if the grantee could be considered a bona fide purchaser, actual or constructive notice of an existing right of equity in the property would deprive the grantee of that status. *Bartels v. Hennessey Bros.*, 164 N.W.2d 87, 94 (Iowa 1969).

Here, the evidence revealed at trial that, pursuant to the terms of the April 29, 1985 offer to purchase between CPAC and Hawkeye, the conveyance was subject to a reservation regarding the possible future conversion of licenses to easements. The

language of the April 29, 1985, offer to purchase stated, in relevant part:

THIS OFFER IS AND THE CONVEYANCE OF THE PREMISES SHALL BE SUBJECT TO THE FOLLOWING PERMITTED EXCEPTIONS, RESERVATIONS, TERMS AND CONDITIONS:

RESERVATIONS (WHICH BUYER AGREES TO TAKE TITLE SUBJECT TO)

(A) *Easements—* ... **a further reservation of the right and privilege of the Seller, its successors, grantees and assigns to convert any existing leases, licenses and agreements for driveways, roads, conduits, sewers, water mains, gas lines, electric power lines, wires and other utilities to permanent easements by issuance of a suitable grant in recordable form for a period of One Hundred Twenty (120) days following the date of closing.**

CPAC conveyed its remaining property rights to Hawkeye on July 1, 1985, by quitclaim deed. The quitclaim deed was silent as to any reservation of the right to convert easements. However, because Hawkeye had submitted the April 29, 1985, offer to purchase, which was accepted by CPAC, Hawkeye was on notice as to the possibility of future conversions of licenses into easements. Actual or constructive notice of an existing right of equity in property deprived Hawkeye of its status of a bona fide purchaser for value. *Bartels v. Hennessey Bros.,* 164 N.W.2d 87, 94 (Iowa 1969). We find there was substantial evidence to support the district court's finding that Hawkeye was on constructive notice of Iowa Power's asserted easement interest in the subject licenses.

As a result, the quitclaim deed from CPAC to Hawkeye could not have conveyed the licenses at issue. Hawkeye knew it would receive, through the quitclaim deed, whatever CPAC had left to convey *after* CPAC exercised its right to convert licenses to permanent easements.

Although Iowa Power delivered the November 6, 1985, check to CPAC shortly after the 120 day deadline, we find substantial evidence that Iowa Power and CPAC reached the agreement regarding the conversion of licenses into easements before this deadline. Iowa Power and CPAC had been negotiating the conversion of the easements since 1983. Richard Myers, the head of Iowa Power's real estate department, testified he had had a conversation with James McKenzie, CPAC's senior easement officer, regarding the conversion agreement. Following the conversation, Myers prepared a written memorandum to McKenzie which stated:

Pursuant to our telephone conversation, Iowa Power and Light Company agrees to the acquisition of permanent easements covering *all* facilities presently located on railroad property, formerly owned by the Chicago and Rock Island Railroad and now held by the Chicago Pacific Corporation for the amount of $95,040.00.

(Emphasis added.) No date was ever given to this conversation, but Myers testified the conversation occurred before October 29, 1985. While McKenzie testified he did not recall the above conversation, Iowa Power subsequently delivered a check to CPAC, with an attached memorandum stating the check was for the acquisition of a permanent easement for *all* of Iowa Power's facilities, in the amount of $95,040. That check was endorsed and cashed by CPAC.

As a result, the quitclaim deed did not convey the licenses at issue to Hawkeye. Pursuant to CPAC's reserved right, the licenses at issue were converted into permanent easements which belonged to Iowa Power. We affirm the district court on this issue.

**II. Admissibility of the Memo of Intent and Other Extrinsic Evidence.** Hawkeye next contends the district court erred in finding the November 12, 1985, memo of intent was inadmissible and refusing to consider extrinsic and parol evidence in interpreting the actual conversion agreement. Hawkeye specifically contends the November 12, 1985, memo of intent, and not the November 6, 1985, check, was the actual conversion agreement.

The statute of frauds requires that contracts for the transfer of any interest in land must be in writing and signed by the party to be charged. Iowa Code § 622.-32(3) (1991). The November 6, 1985, check for $95,040 conveyed an interest in land (Iowa Power's acquisition and CPAC's grant of permanent easements for all of Iowa Power's facilities) and was endorsed by CPAC. However, the district court found the November 12, 1985, memo of intent did not govern CPAC's transaction. The memo of intent was not signed by Iowa Power, and therefore the signature element of the statute of frauds had not been satisfied.

Hawkeye contends the memo of intent was excepted from the statute of frauds by Iowa Code section 622.33, which states:

> The provisions of subsection 3 of section 633.32 do not apply where the purchase money, or any portion thereof, has been received by the vendor, or when the vendee, with the actual or implied consent of the vendor, has taken and held possession of the premises under and by virtue of the contract, or when there is any other circumstance which, by the law heretofore in force, would have taken the case out of the statute of frauds.

Iowa Code § 622.33 (1991) (emphasis added). "Purchase money" has been defined to mean "consideration." *Recker v. Gustafson*, 279 N.W.2d 744, 749 (Iowa 1979). Hawkeye argues that the check for $95,040 constituted purchase money, and thus removed the memo of intent from the statute of frauds.

The reasoning behind this exception is that payment of the purchase price is considered a part performance of the contract. *In re Estate of Lindsey*, 254 Iowa 699, 711, 118 N.W.2d 598, 605 (1962). However, any acts, conduct, or circumstance offered to show "part performance" must be referable exclusively and unequivocally to the contract. *Id.* Therefore, evidence of the payment of purchase money may remove a contract from the application of the statute of frauds if the payment *follows* the making of the contract.

Here, substantial evidence, including Myers' own testimony, supports the finding that Myers delivered the check to CPAC shortly after November 6, 1985, but *before* the November 12, 1985, memo of intent was authored. Therefore, section 622.33 does not apply. We find evidence of the November 12, 1985, memo of intent was properly excluded by the district court under the statute of frauds.

Hawkeye also contends the district court erred in refusing to consider extrinsic and parol evidence in ascertaining the meaning of the conversion agreement. Specifically, Hawkeye contends the district court erred in excluding evidence as to the circumstances surrounding the negotiation and execution of the conversion agreement.

Regarding the parol evidence rule, our supreme court has stated:

> Although extrinsic evidence may be admissible to explain the real meaning of the parties by the language used in a contract, the parol evidence rule forbids the use of extrinsic evidence to vary, add to, or subtract from a written agreement.

*Montgomery Properties Corp. v. Economy Forms Corp.*, 305 N.W.2d 470, 477 (Iowa 1981) (citations omitted). *See also Farmers State Bank v. Huebner*, 475 N.W.2d 640, 643 (Iowa App.1991). Where the words of a contract are plain and clear, evidence of surrounding circumstances to aid interpretation is not admissible. *Hamilton v. Wosepka*, 261 Iowa 299, 308, 154 N.W.2d 164, 168 (1967).

Hawkeye clearly sought the admission of witness testimony and the November 12, 1985, memo of intent in an attempt to prove the conversion agreement only converted the eighteen licenses for which there existed written easement grants. As a result, Hawkeye was attempting to contradict, not just explain, the terms of what the district court found to be the conversion agreement.

The language on the conversion agreement was clear and unambiguous, as it provided for the "acquisition of permanent easement for *all* facilities on Chicago Rock Island right of way." (Emphasis added.)

In other words, for $95,040, CPAC would discharge all licenses between CPAC and Iowa Power and grant Iowa Power permanent easements for all of its facilities. We find the district court did not err in refusing to consider extrinsic and parol evidence in interpreting the meaning of the conversion agreement.

**III. Hawkeye's Burden of Showing the Agreement to Convert Only Eighteen Licenses.** Hawkeye also contends the district court erred in requiring Hawkeye to prove that none of the thirty-one licenses in dispute had been originally marked by Iowa Power on the detailed railroad track maps. Hawkeye further argues that, even if Hawkeye did have this burden, it carried it by substantial evidence.

The original track maps on which Iowa Power marked all of its facilities for conversion would have established whether Iowa Power only marked those facilities which were reflected in the eighteen easement grants. Hawkeye's theory was that the agreement between Iowa Power and CPAC was to convert only those licenses which Iowa Power had marked on the engineering maps.

A party who seeks recovery on a contract has the burden to prove the existence of a contract. *Roland A. Wilson & Assocs. v. Forty-O-Four Grand Corp.*, 246 N.W.2d 922, 925 (Iowa 1976). The district court did not err in requiring Hawkeye, the plaintiff, to prove its theory. Furthermore, as these detailed maps were never even offered into evidence, we find there was not substantial evidence to prove Hawkeye's theory.

**IV. Mistake of Contract.** Hawkeye also contends, in several separate arguments throughout its brief, the district court erred in not finding evidence which established Iowa Power's mistake of contract.

The district court made no specific findings regarding the issue of mistake of contract. Hawkeye never raised this issue at trial, and Iowa Power never raised the defense of mistake of contract. Rather, Iowa Power had argued the agreement between CPAC and Iowa Power was for the conversion of all licenses to permanent easements. Iowa Power contended this agreement was evidenced by the November 6, 1985, check which CPAC had subsequently endorsed and cashed.

We initially note "[a]ny defense that a contract or writing sued on is void or voidable, ... or which alleges any matter in justification, excuse, release or discharge ... must be specially pleaded." Iowa R.Civ.P. 101. Generally, mistake is an affirmative defense which must be plead if the defendant intends to rely upon it. 54 Am.Jur.2d *Mistake, Accident, or Surprise* § 25 (1971).

However, because the issue of mistake was never raised at trial, we simply find no preservation of error. The appellate court will not review issues which were not presented to the district court. *State ex rel. Iowa Dep't of Human Servs. v. Duckert*, 465 N.W.2d 871, 873 (Iowa 1991). Therefore, we determine this issue is without merit.

**V. Equitable Estoppel.** Hawkeye also contends the district court's conclusion that equitable estoppel would deny Hawkeye recovery was not supported by substantial evidence.

As an alternative ruling, the district court found that, even if Iowa Power had received something less than permanent easements for all of facilities under the conversion agreement, Hawkeye was equitably estopped from asserting its alleged rights to unpaid rent.

Equitable estoppel is a doctrine invoked to avoid injustice. *Bricker v. Maytag Co.*, 450 N.W.2d 839, 841 (Iowa 1990). The elements of equitable estoppel are as follows:

1. A false representation or concealment of material facts;

2. A lack of knowledge of the true facts on the part of the actor;

3. The intention that it be acted upon; and

4. Reliance thereon by the party to whom made, to his or her prejudice and injury.

*Id.* (citing *Fernandez v. Iowa Dep't of Human Servs.*, 375 N.W.2d 701, 708 (Iowa 1985)).

We agree with the district court's finding that Hawkeye was equitably estopped from seeking the unpaid rent. In doing so, we adopt the reasoning of the district court:

First, if Iowa Power was not receiving a permanent easement for all of its facilities at the time of its contract with CPAC, CPAC falsely represented these facts to Iowa Power (element 1). Second, Iowa Power had no knowledge it was not receiving a permanent easement for all of its facilities at that time (element 2). Third, CPAC intended Iowa Power rely upon this misrepresentation, inasmuch as CPAC never informed Iowa Power it was receiving anything less than a full and complete permanent easement for all facilities (element 3). Finally, Iowa Power relied on CPAC's representation, now allegedly false, it was receiving an easement for all of its facilities and Iowa Power stands to be damaged as a result of CPAC's apparent concealment of all the facts (element 4).

The facts clearly established CPAC knew Iowa Power was seeking an easement for all of its facilities. Myers, of Iowa Power, testified he had informed CPAC of Iowa Power's intent to convert all of its facilities. Iowa Power's intent was reflected both in the written memorandum Myers prepared regarding his conversation with McKenzie, and in the $95,040 check which was delivered to CPAC. Although CPAC cashed this check, CPAC never informed Iowa Power the language on the check was allegedly incorrect. As a result of these circumstances, the district court's finding that the doctrine of equitable estoppel prevented Hawkeye's recovery was supported by substantial evidence.

The costs of this appeal are taxed to Hawkeye.

For the reasons stated, we affirm the judgment of the district court.

**AFFIRMED.**